# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00737-CV

---

**BMC West Corporation a/k/a BMC West, LLC and Julian Noe Silva, Appellants**

**v.**

**Martha Karlson, as Independent Administrator of the
Estate of Joyce Angela Williams, Deceased, Appellee**

---

**FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
NO. C-1-PB-19-001339, THE HONORABLE GUY S. HERMAN, JUDGE PRESIDING**

---

## CONCURRING AND DISSENTING OPINION

I concur in part and dissent in part from the Court's opinion and judgment in this appeal.

For the reasons explained below, I dissent from the part of the Court's opinion concluding that BMC established that the record contains no evidence supporting a finding of negligent supervision or negligent retention or a finding of BMC's negligent lack of an adequate safety policy and program for its drivers. Therefore, I also dissent from the opinion's holding that Karlson lacks a direct-negligence basis for holding BMC liable for gross negligence. As a result, I would affirm the judgment awarding Karlson compensatory damages against BMC for its own negligence, and I would reach the issue of whether Karlson proved that BMC's negligence rose to the level of gross negligence, and if necessary, the issue of whether North Carolina law or Texas law should apply to the issue of the exemplary-damages cap.

In addition, I dissent from the part of the Court's opinion concluding that the trial court abused its discretion by both instructing the jury on BMC's spoliation of evidence and admitting evidence of spoliation before the jury. (Slip. op. at 28.) I would conclude that the trial court correctly determined that BMC and Silva intentionally spoliated evidence, an issue that the Court assumes but does not decide. I would further conclude that the trial court did not abuse its discretion by imposing a jury instruction as a remedy for that intentional spoliation or by allowing testimony about the contents of the missing evidence. Accordingly, I would not reverse and remand for a new trial on the remaining compensatory damages for Williams's physical pain and mental anguish.[1]

**Sufficiency of evidence of BMC's direct negligence**

Karlson alleged against BMC negligent hiring, negligent entrustment, negligent training, negligent supervision, negligent retention, and negligence by lacking an adequate safety policy and program for all its drivers. I dissent from the Court's conclusions that the evidence

---

[1] It is not clear to me from the Court's opinion exactly why any claims are being remanded for a new trial. At trial, BMC and Silva conceded that Silva's direct negligence caused the wreck, and BMC accepted respondeat superior liability for Silva's negligence. Thus, the compensatory damages awarded against Silva stand, and BMC remains jointly and severally liable for those damages. The Court has reversed the jury's finding that BMC is directly negligent and rendered judgment that Karlson take nothing on her direct-negligence claims against BMC, removing any basis for the jury's finding of liability for gross negligence against BMC. The Court overruled BMC and Silva's issue arguing that no evidence showed the actual mental anguish that Williams suffered, and therefore, it did not render a take-nothing judgment on mental-anguish damages, as sought by BMC and Silva. I concur in that portion of the Court's opinion. However, the Court did not address BMC and Silva's issue asserting that the evidence was insufficient to support the amounts of mental-anguish and physical-pain damages awarded because "those arguments here would, if meritorious, result merely in remand for new trial." (Slip op. at 21 n.12.) If those claims are being remanded because of the Court's holding on the spoliation remedy, then I would first address the sufficiency of the evidence supporting those damages because the evidence admitted on those claims did not include any testimony or other evidence related to BMC and Silva's spoliation of evidence.

2

was legally insufficient to support Karlson's claims of negligent supervision, negligent retention, and negligence in lacking an adequate safety policy.

The Court holds that Karlson's evidence of proximate cause for her claims of negligent supervision and of negligence in lacking an adequate safety policy was legally insufficient. (Slip op. at 16.) The Court bases its holding on the testimony of Karlson's expert on industry safety standards for commercial trucking, Mark Respass, characterizing his testimony as supporting a mere possibility—not a reasonable probability—that negligent supervision and an inadequate safety program were causes of Williams's injuries. *Id.* However, the quoted portion of the record omits the following testimony elicited on redirect:

> Q. (BY MR. KILDAY) Mr. Respass, if [BMC] had noticed that [Silva] had been speeding and engaging in harsh braking events in the months preceding the accident and had taken corrective action with him and then terminated him if he was not following through on the corrective action, that would have prevented this accident, wouldn't it?
>
> A. Yes.

This is not a case where Respass's testimony was "the byproduct of possibilities." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 350 (Tex. 2015). "Reasonable probability is determined by the substance and context of the opinion, and does not turn on semantics or on the use of a particular term or phrase." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995). Silva's own testimony was that he "suddenly saw" the car stop before he rear-ended it while it was stopped to turn left. The evidence showed that the car had not suddenly stopped but instead had gradually slowed with the left-side blinker on while stopping to turn and that Silva did not begin braking until less than a second before impact. Respass also testified at length about the telematics data that was available to BMC about its drivers' driving

3

behavior and that it is standard industry practice to use that data to monitor, supervise, and coach their drivers. Evidence was admitted that Silva had exceeded the maximum speed of 68 miles per hour that BMC mandated for its drivers 155 times in the 30 days before the accident and had two incidents of "harsh braking" (other than the one immediately preceding his collision with the vehicle Williams was in), which Respass testified is indicative of distracted driving, in that time period.[2] Respass testified that the industry practice is to bring a driver in for coaching and progressive discipline when telematics data identifies a driver's unsafe driving behavior. The record shows that before the accident BMC did not take corrective action in response to Silva's pattern of driving at unsafe speeds or after any harsh-braking incidents. The record evidence shows that Silva was driving over 60 miles per hour on a road where the speed limit was 55 miles per hour up until the instant before impact when he began braking.

In addition to Respass's testimony, evidence was also admitted that in the 30-day period before the accident, 50% of Silva's voice calls were made while he was verifiably driving, and 79% of his data activity occurred while he was verifiably driving, and that BMC had a "very permissive" cell-phone usage policy. Silva had both his personal cell phone and his BMC-provided cell phone (in its BMC-provided dashboard holder) active at the time of the crash. The jury heard conflicting testimony about what Silva was doing with the phones at the time of the accident that was the jury's province to resolve. Besides the data regarding the activity on Silva's phone at the time of the crash, Karlson put on evidence showing that it took Silva 11 seconds to respond to the stopped vehicle in front of him, as well as circumstantial

---

[2] The record reflects that the module that retains sudden deceleration (harsh braking) events on Silva's truck only retains the three most recent events. The module showed that there was the one on the day of the accident, and two others, one occurring 2100 miles before and another occurring 2800 miles before within the thirty days before the accident.

evidence that Silva inexplicably swerved 90 seconds before the crash from the left lane to the right lane and then back to the left lane without using his turn signal, which BMC's own documents describe as a hallmark of distracted driving. Distracted driving was the reason given for the crash on the form documenting BMC's root-cause analysis of the accident.

BMC argues that Respass's testimony is unreliable because it is based on mere possibility instead of probability, but the cases that BMC relies on for this proposition are all cases involving scientific expert testimony. Here, Respass's expert testimony describing his analysis of whether safety measures could have prevented an accident is not a scientific inquiry, and in such cases, we "consider whether there is an 'analytical gap' between the experts' opinions and the bases on which they were founded." *Taylor v. American Fabritech, Inc.*, 132 S.W.3d 613, 619 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)). Here, there is no analytical gap between the record evidence of Silva's driving-performance issues, BMC's lack of monitoring and corrective training based on the data available to it, and the conclusion that a reasonable probability exists that such monitoring and corrective training would have either improved Silva's driving performance or led to his termination, either of which probably would have prevented the accident. Based both on Respass's testimony, and the other evidence in the record, I would conclude that the evidence is legally sufficient to support the elements of causation for Karlson's claims of negligent supervision and negligence in lacking an adequate safety policy, and therefore, I dissent from the Court's holding on these claims.

Furthermore, as I will discuss in more detail below, because I conclude the spoliation instruction was appropriate and not an abuse of discretion, the jury was also entitled to consider that the missing telematics data from the date of the crash and the five months before

5

December 9, 2018, would have been unfavorable to BMC on the issue of whether it had notice of speeding, harsh-braking incidents, or other driving-performance failures involving Silva during those time periods, providing further support for a finding in Karlson's favor. In my opinion, the jury's ability to consider this missing data as unfavorable to BMC would also support a finding that BMC breached its duty by retaining Silva as an employee, so I dissent from the Court's holding that the evidence is legally insufficient to support the jury's finding of negligent retention of Silva by BMC. The jury had evidence before it of 155 times that Silva violated BMC's speed policy and at least two times in the weeks before the accident that Silva had a harsh-braking incident, which is indicative of distracted driving. The jury was instructed that it could consider that the missing data could add unfavorably to this record of Silva's driving-performance issues, which would support its finding that BMC was negligent in allowing Silva to continue to drive.

**No abuse of discretion to instruct the jury on spoliation and allow testimony about the missing evidence**

I also dissent from the Court's holding that the trial court abused its discretion by remedying BMC's and Silva's intentional spoliation of evidence with a jury instruction and allowing Karlson's witnesses to refer to the missing evidence. Karlson moved for a spoliation instruction, asserting that BMC and Silva had intentionally spoliated evidence by failing to take reasonable and appropriate steps to preserve and prevent the destruction of relevant evidence after the accident. The motion asserted that both BMC and Silva were aware of the severity of the crash at issue which sent both Williams and the driver to the hospital with severe injuries, which should have put them on notice of their duty to preserve evidence, and in addition, they

received a letter days after the crash reminding them of their duty. After an evidentiary hearing, the trial court granted the motion. Accordingly, the jury received the following instruction:

> You are further instructed that BMC failed to preserve the following evidence in this case:
>
> - a complete set of cell phone data from January 2019, including web browsing history;
>
> - a complete set of telematics data on the date of the crash;
>
> - any telematics data for the 5 months prior to December 9, 2018;
>
> - any driver logs for the six months preceding January 9, 2019.
>
> You may consider that this evidence would have been unfavorable to BMC on the issues of (i) whether Silva was using the cell phone at the time of the crash, and (ii) whether BMC had notice of speeding, harsh braking incidents, or other driving performance failures involving Silva during the above time periods.

Based on my review of the evidence, I would conclude that the trial court did not abuse its discretion by concluding that BMC and Silva intentionally spoliated evidence, an issue that the Court does not reach because it concludes that the trial court erred by choosing to remedy that intentional spoliation with a jury instruction.

I dissent from the Court's conclusion that the trial court committed reversible error because the record does not show "express consideration by the trial court of any sanction less than the spoliation instruction or any express finding that this case is an exceptional spoliation case." (Slip op. at 27.) In *Brookshire Brothers, Ltd. v. Aldridge*, the Texas Supreme Court set forth the analytical framework for determining whether an act of spoliation occurred and the proper remedy for it. 438 S.W.3d 9, 14 (Tex. 2014). The court held that "the harsh remedy of a spoliation instruction is warranted only when the trial court finds that the spoliating

7

party acted with the specific intent of concealing discoverable evidence, and that a less severe remedy would be insufficient to reduce the prejudice caused by the spoliation." *Id.*

Here, the Court concludes that the record lacks "any express consideration by the trial court of any sanction less than the spoliation instruction or any express finding that this case is an exceptional spoliation case." (Slip op. at 27.) I disagree with this conclusion. The Texas Supreme Court held that when the trial court concludes that intentional spoliation occurred and "a lesser remedy would be insufficient to ameliorate the prejudice caused by the spoliating party's conduct, the trial court is within its discretion in submitting an instruction." *Brookshire Bros.*, 438 S.W.3d at 25. The court explained that "'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation," means "that the party acted with the subjective purpose of concealing or destroying discoverable evidence. This includes the concept of 'willful blindness,' which encompasses the scenario in which a party does not directly destroy evidence known to be relevant and discoverable, but nonetheless 'allows for its destruction.'" *Id.* at 24.

In this case, Karlson argued that BMC and Silva intentionally spoliated evidence and that a jury instruction was the only appropriate remedy. BMC and Silva, on the other hand, argued that an instruction would make the jury think they had done something wrong when no evidence showed they had, and moreover, that they had produced sufficient relevant evidence to allow Karlson to prove her claims, meaning "any type of spoliation instruction, in our view and our argument, would not be proper."

When discussing the possible remedies available in the spoliation context, the Texas Supreme Court identified some of the remedies enumerated in Rule 215.2 of the Texas Rules of Civil Procedure, including "an award of attorney's fees or costs to the harmed party, exclusion of evidence, striking a party's pleadings, or even dismissing a party's claims," in

8

addition to the submission of a spoliation instruction to the jury.[3]  *See id.* at 21 (citing Tex. R. Civ. P. 215.2-.3).  Here, neither the Court nor BMC and Silva have identified any other lesser remedy that the trial court should have imposed instead of a jury instruction.  "The remedial purpose undergirding the imposition of a spoliation remedy under Texas law . . . is to restore the parties to a rough approximation of their positions if all evidence were available."  *Id.*

I would not conclude that the trial court erred because it did not expressly state that it considered and disregarded other remedies when no lesser remedy would have restored Karlson to a rough approximation of the position she would have been in if all evidence were available—and no one argued otherwise.[4]  BMC and Silva argued only for no remedy, not for a lesser remedy.  The trial court conducted an evidentiary hearing that bore on "the factors associated with evaluating prejudice to the nonspoliating party."  *Id.* at 22.  Those factors "include the relevance of the spoliated evidence to key issues in the case, the harmful effect of the evidence on the spoliating party's case (or, conversely, whether the evidence would have been helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used instead of the spoliated evidence."  *Id.* at 21-22.  And as the supreme court pointed out in *Brookshire Brothers*, "a party's intentional destruction of evidence may, '[a]bsent evidence to the contrary,' be sufficient by itself to support

---

[3]  "The most severe sanction for evidence spoliation is to dismiss the action or render a default judgment."  *Trevino v. Ortega*, 969 S.W.2d 950, 959 (Tex. 1998) (Baker, J., concurring).

[4]  I note that the spoliation instruction submitted to the jury is the less severe of the two types of presumptions identified by Justice Baker in his *Trevino* concurrence because "[i]t is merely an adverse presumption that the evidence would have been unfavorable to the spoliating party," rather than an instruction that shifts the burden of proof on the issue to the spoliating party to disprove the presumed fact or issue.  *See Trevino*, 969 S.W.2d at 960.

a finding that the spoliated evidence is both relevant and harmful to the spoliating party."[5] *Id.* at 22 (footnote omitted) (quoting *Trevino v. Ortega*, 969 S.W.2d 950, 959 (Tex. 1998) (Baker, J., concurring)). I would conclude that the trial court appropriately considered the factors related to prejudice in light of the missing evidence in this case and did not abuse its discretion by concluding that a jury instruction is the only remedy that would restore Karlson to a rough approximation of the position she would have been in if all evidence were available.

I also dissent from the Court's conclusion that the trial court's admission of evidence related to the missing data constituted reversible error. As the Texas Supreme Court explained in *Brookshire Brothers*,

> That said, we recognize that all references to missing evidence, whether lost due to a party's spoliation or missing for some other reason, cannot and should not be foreclosed. For example, to the extent permitted by the Texas Rules of Evidence, parties may present indirect evidence to attempt to prove the contents of missing evidence that is otherwise relevant to a claim or defense, such as a person's testimony about the content of a missing document, photo, or recording. *See* Tex. R. Evid. 1002 (noting the general rule that an original writing, recording, or photograph is required to prove the content thereof); *see also, e.g.*, Tex. R. Evid. 1004(a) (noting an exception to the general rule when the originals are lost or destroyed, "unless the proponent lost or destroyed them in bad faith"). However, there is no basis on which to allow the jury to hear evidence that is unrelated to the merits of the case, but serves only to highlight the spoliating party's breach and culpability. While such evidence may be central to the trial court's spoliation findings, it has no bearing on the issues to be resolved by the jury.

---

[5] The other two cases relied on by the Court to support its holding that the trial court reversibly erred by submitting the spoliation instruction without an express statement about its consideration and rejection of lesser sanctions are distinguishable from this case. *Petroleum Solutions, Inc. v. Head* involved the imposition of both a spoliation instruction and the striking of the spoliating parties' affirmative defenses in the absence of evidence supporting intentional spoliation. 454 S.W.3d 482, 487, 489-90 (Tex. 2014). *In re On Track Experience, LLC*, involved the alleged offensive conduct of the alteration of one line of a document, and this Court concluded that excluding the entire document was contrary to the remedial purpose of a spoliation remedy because it placed the nonspoliating party in a better position than if the evidence was available in an unaltered state. No. 03-21-00304-CV, 2021 WL 4876949, at *2 (Tex. App.—Austin Oct. 20, 2021, orig. proceeding) (mem. op.).

*Id.* at 26-27. In *Brookshire Brothers*, the court concluded that while "the trial court erred in admitting evidence of the circumstances surrounding the failure to preserve additional video footage, though only to the extent such evidence was unrelated to the merits and served principally to highlight Brookshire Brothers' culpability, . . . nonspeculative testimony relating to what the missing video would have shown, such as the testimony about the cleanup [in a slip-and-fall case], was not problematic." *Id.* at 28-29.

In this case, although Karlson did question some experts about the missing data, she did not do so in a manner unrelated to the merits that "served principally to highlight [BMC's and Silva's] culpability" in the spoliation of evidence. Nor did she elicit testimony relevant only to whether they breached a duty to preserve evidence or acted with the requisite intent. *See id.* at 29. While she did refer in her opening and closing arguments to the "sick" "culture of coverup" at BMC, she did so in connection with her arguments regarding the alleged falsity of Silva's written statement after the accident and its conflict with other evidence about the events of the accident, the alleged falsification of documents by Silva's supervisor, the supervisor's allegedly false testimony about Silva's training (both initial training and after the accident), and BMC's belated acceptance of responsibility for Silva's actions. The discussion of BMC's failure to preserve and produce the data listed in the jury instruction was not discussed in Karlson's closing until after counsel's argument about Silva's cell-phone usage. It was discussed in connection with the alleged failures of BMC's safety policies. The argument made was that BMC's expert had testified that the five months of missing data would be a violation that could result in an enforcement action and that the missing driver logs made it impossible for Karlson's expert to do a full and fair analysis of BMC's driver-safety program. Karlson's counsel also reminded the jury of the trial court's instruction that they may consider the evidence of what was

11

not preserved and that the evidence "would have been unfavorable to BMC on these key issues, whether Mr. Silva was using his cell phone, whether BMC had notice of speeding, whether BMC had notice of harsh braking incidents, whether BMC had notice of other driving performance failures during these time periods." Because I disagree with the Court's characterization of the trial court's allowance of some discussion of the missing evidence as improperly focused on BMC's and Silva's spoliation as opposed to the missing evidence's relation to the merits of the case, I would conclude the trial court did not err in allowing the testimony and argument about the missing data.

## CONCLUSION

I respectfully dissent from the Court's opinion and judgment as explained above, and I concur with the Court's holdings on the remaining issues.

_____
Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Filed: December 5, 2025

12